**STATE of Minnesota, Respondent,**

v.

**Susan Ranae JACKSON, Appellant.**

**No. A05–247.**

Supreme Court of Minnesota.

Dec. 6, 2007.

John M. Stuart, State Public Defender, Davi E. Axelson, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Lori Swanson, Attorney General, Thomas R. Ragatz, Assistant Attorney General, St. Paul, MN, John J. Muhar, Itasca County Attorney, Grand Rapids, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Susan Ranae Jackson was charged with two counts of second-degree controlled substance crime in violation of Minn.Stat. § 152.022, subds. 1(1), 2(1) (2006), and two counts of child endangerment in violation of Minn.Stat. § 609.378, subd. 1(b)(2) (2006). Before her trial, Jackson moved to suppress evidence seized from her home on the ground that the police executed a search warrant with an invalid authorization for a nighttime search. The Itasca County District Court concluded that the issuance of the nighttime warrant for Jackson's home was not justified, but denied Jackson's motion to suppress the evidence found as a result of the search. The court based its denial of the suppression motion on the ground that the nighttime search warrant violation was statutory rather than constitutional and that under the facts and circumstances of this case, the statutory violation did not require suppression of the evidence. At trial, the court found Jackson guilty on all four counts. The court entered convictions on one controlled substance count and the two child endangerment counts and sentenced

Jackson to 105 months in prison for the controlled substance count and 12 months each for the two child endangerment counts. The court ordered all three sentences to be served concurrently. On appeal, the court of appeals affirmed the district court and we granted review on the suppression issue. We reverse.

On December 11, 2003, Itasca County Sheriff's Department Investigator Dean Scherf was conducting a narcotics investigation that involved Todd Dawson and the appellant, Susan Ranae Jackson. At about 6:30 p.m., Scherf executed a search warrant on Dawson's vehicle after Dawson left Jackson's home. During this search, Scherf found a large amount of methamphetamine, cash, and other items consistent with selling and dealing illegal drugs. Based on the contraband found in Dawson's car and on information obtained from both Dawson and a confidential reliable informant, Scherf applied to the district court for a warrant to search Jackson's home and her person. The affidavit supporting the search warrant read in pertinent part:

As a result of the Search Warrant on the Dawson [sic] your affiant seized approx. 53 grams of suspected methamphetamine from the vehicle along with a large amount of cash, a digital gram scale, and plastic baggies. All of these items are indicative of a drug dealer. Your affiant knows this from knowledge, training, and experience.

The [confidential reliable informant] that your affiant spoke to in reference to Dawson having controlled substances in his vehicle also indicated that Dawson was at the Susan Jackson residence at the time the controlled substances were observed in Dawson's vehicle. The [confidential reliable informant] also relayed that Dawson had dropped some methamphetamine off at the Jackson resi-

dence and that Jackson also sells methamphetamine from her residence. Your affiant did verify that Dawson was at the Jackson residence prior to making the traffic stop on Dawson.

Dawson advised your affiant at the time of the traffic stop that he has been staying at the Susan Jackson residence and furthermore that Dawson has been dating Jackson.

Based on the foregoing facts in his affidavit, Scherf requested a search warrant authorizing the police to conduct a nighttime search as provided for under Minn. Stat. § 626.14 (2006). In support of the nighttime search authorization, Scherf also stated in the affidavit that "[t]his investigation has led your affiant into the nighttime [sic] scope of search warrant." Scherf provided no further information to support a nighttime search.

The district court granted a search warrant authorizing a nighttime entry, and at 9:25 p.m. on December 11 officers from the Itasca County Sheriff's Department executed the warrant on Jackson's home. The officers knocked on Jackson's door and then entered the home, where they found Jackson sitting at the kitchen table with her two teenaged children. The officers handcuffed Jackson and informed her that they were in her home to search for illegal drugs. Jackson initially denied having any illegal drugs. Scherf told Jackson that if she did not tell the officers where the illegal drugs were, they would "tear the house apart" looking for the drugs. Jackson then told the officers that she wanted to speak to them outside of the presence of her children. Acceding to this request, the officers led Jackson to her bedroom. After going into the bedroom with the officers, Jackson did lead the officers to multiple locations in the home that contained drugs. As a result of this search, the officers seized 9.7 grams of

methamphetamine and drug paraphernalia from Jackson's home. The police then arrested Jackson and the state charged her with two counts of second degree controlled substance crime for the possession and sale of methamphetamine in violation of Minn.Stat. § 152.022, subds. 1(1), 2(1), and two counts of child endangerment in violation of Minn.Stat. § 609.378, subd. 1(b)(2).

Before trial, Jackson moved to suppress the evidence seized during the search of her home arguing that the search violated Minn.Stat. § 626.14 (2006) because Scherf's affidavit failed to articulate a sufficient basis to support a nighttime search. The district court agreed with Jackson and concluded that the issuance of a nighttime search warrant for her home was not justified. But the court denied Jackson's motion to suppress the evidence seized during the search because the court concluded that the nighttime search violation was statutory rather than constitutional and that, under the facts and circumstances of this case, the statutory violation did not require suppression of the evidence. Jackson subsequently pleaded guilty to one controlled substance count in exchange for the other counts against her being dismissed. But, after learning that her guilty plea would prevent her from appealing the court's denial of her suppression motion, Jackson withdrew her guilty plea and proceeded to a court trial on stipulated facts under *State v. Lothenbach*, 296 N.W.2d 854 (Minn.1980).[1]

The district court found Jackson guilty of all charges and entered convictions for one controlled substance count and two child endangerment counts. The court sentenced Jackson to 105 months in prison for the controlled substance conviction and 12 months for each of the two child endangerment convictions, all sentences to be served concurrently. The court of appeals affirmed the district court's denial of Jackson's suppression motion.

I.

On appeal to our court, Jackson claims that the police failed to provide sufficient justification for a nighttime search of her home and therefore the issuance of the nighttime search warrant violated Minn. Stat. § 626.14 and both the United States and Minnesota constitutions. She asserts that the district court therefore erred when it denied her suppression motion. The state does not dispute that the nighttime search of Jackson's home was improperly authorized under Minn.Stat. § 626.14. More specifically, the state does not explicitly contest the conclusion of the district court and the court of appeals that the search warrant application "did not make a sufficient showing to justify inclusion of the nighttime search clause." Nevertheless, the state argues that the district court did not err when it admitted the evidence obtained as a direct result of the invalid search.

Minnesota Statutes § 626.14 provides that

[a] search warrant may be served only between the hours of 7:00 a.m. and 8:00 p.m. unless the court determines on the basis of facts stated in the affidavits that a nighttime search outside those hours is necessary to prevent the loss, destruction, or removal of the objects of the search or to protect the searchers or the public.

We have held that an application for a nighttime warrant under section 626.14

---

1. A court trial on stipulated facts under *Lothenbach* is a means of preserving the defendant's right to appeal a pretrial suppression motion, which a guilty plea would extinguish. *Lothenbach*, 296 N.W.2d at 857–58; *see also* Minn. R.Crim. P. 26.01, subd. 3.

must establish reasonable suspicion that a nighttime search is necessary to preserve evidence or to protect officer or public safety. *State v. Bourke*, 718 N.W.2d 922, 927 (Minn.2006). Here it is undisputed that the required grounds for a nighttime search were not established by the police. Thus, the only question before us on appeal is whether the district court erred when it did not suppress the evidence seized during the admittedly improper nighttime search. When reviewing pretrial orders on motions to suppress evidence, we independently review the facts to determine whether, as a matter of law, the court erred in its ruling. *Bourke*, 718 N.W.2d at 927. We review the court's factual findings for clear error and its legal determinations de novo. *Id.*

We have previously stated that we will not require the suppression of evidence obtained in violation of a statute or rule when the violation is merely technical and "did not subvert the basic purpose of the statute." *State v. Smith*, 367 N.W.2d 497, 504 (Minn.1985). In *Smith*, the defendant moved unsuccessfully to suppress evidence seized from his hotel room after the police obtained the defendant's address from the county department of social services in violation of the Minnesota Government Data Practices Act. *Id.* at 503. On review, we reasoned that the main purpose of the Data Practices Act, as applied to the defendant, was to prevent disclosure of information identifying the defendant as a recipient of welfare benefits. *Id.* at n. 1. Because the welfare records in *Smith* were used simply to identify the defendant's residence and not to disclose his welfare status, we held that the violation "did not subvert the basic purpose of the statute," and therefore did not require suppression.

*Id.* at 504; *see also Johnson v. State*, 673 N.W.2d 144, 150 (Minn.2004); *State v. Lien*, 265 N.W.2d 833, 841 (Minn.1978).

But we have also held that "serious violations which subvert the purpose of established procedures will justify suppression." *State v. Cook*, 498 N.W.2d 17, 20 (Minn. 1993). In *Cook*, we concluded that evidence seized pursuant to a telephonic search warrant required suppression when the procedures for obtaining the warrant were violated. *Id.* at 21–22. We noted that Fed.R.Crim.P. 41(c)(2), which we had previously adopted as the procedure required for obtaining a telephonic search warrant in Minnesota, requires that a record of the entire call be made either by voice recording, stenography or longhand.[2] *Id.* at 19–20. The rule also requires that the officer requesting the warrant prepare a document in advance and read it verbatim to the magistrate, who then must transcribe it verbatim onto the original warrant. *Id.* at 20. In *Cook*, the officer did not read his statement from a prepared, written statement, no simultaneous notes were made by the magistrate, and no voice or longhand recording was made of the call. *Id.* at 19. Our decision to affirm the grant of defendant's suppression motion was based on the ground that the violation subverted the basic purpose of the rule, which "is to have a record made contemporaneously with the authorization of the search warrant * * * so that later, if need be, there is a basis for challenging the warrant that is not dependent solely on after-the-fact recollections." *Id.* at 20.

Based on the foregoing case law, the question before us is whether the 9:25 p.m. police search of Jackson's home without valid authorization for a nighttime search is a serious violation that subverts the

2. The Minnesota rule governing telephonic search warrants, Minn. R.Crim. P. 36, was adopted the year after our decision in *Cook*.

basic purpose of section 626.14. If we conclude that it is, our case law indicates that the evidence seized during the search should be suppressed; but if the violation is merely technical in nature, then suppression is not required.

In determining the purpose of section 626.14, we note that the statute appears to represent a codification and application of a legal history that illustrates an aversion to nighttime searches. Therefore, in determining the purpose of the statutory limitations on nighttime searches, we must examine this historical aversion to such searches. Further, we have also stated that the general rule against nighttime searches may have a constitutional dimension and thus implicates constitutional protections against unreasonable searches and seizures. *See Lien*, 265 N.W.2d at 839–40. Accordingly, we believe that our determination of whether the police's violation of section 626.14 subverts the purpose of the statute should include a review of what was considered an unreasonable nighttime search when the United States Constitution was adopted and what factors have led to the general rule against nighttime searches.

Historic Aversion to Nighttime Searches

■ Certain provisions of the U.S. Constitution, which was adopted in 1787, and the Fourth Amendment, which was ratified in 1791, were in part a reaction to the general warrants of England and the writs of assistance used in the colonies. *Steagald v. United States*, 451 U.S. 204, 220, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981). General warrants specified only an offense and left the decision of whom to arrest and where to search to the discretion of the official executing the warrant. *Id.* Writs of assistance, which were used to locate smuggled goods, specified the object of the search, but left officials free to search any place where they believed the object might be found. *Id.;* Nelson B. Lasson, *The History and Development of the Fourth Amendment to the United States Constitution*, 55 Johns Hopkins U. Stud. Hist. & Pol. Sci. 54 (1937). A writ of assistance thus gave customs officials almost unlimited discretion regarding the question of where to search. *Lasson, supra* at 54. But, importantly, the writ could be executed only during the daytime.[3] *Id.*

Before 1750, nighttime searches were authorized under law in the northern and central colonies and were the norm in other colonies. Tracey Maclin, *The Complexity of the Fourth Amendment: A Historical Review*, 77 B.U.L.Rev. 925, 971 (1997) citing William J. Cuddihy, *The Fourth Amendment: Origins and Original Meaning, 602–1791*, at 865–66 (1990) [hereinafter Cuddihy]. But by the 1780s, every state except Delaware had enacted a statute barring nighttime searches. *Id.* (citing Cuddihy, *supra* at 1346 & n. 228). Even the states that still allowed general warrants did not allow nighttime searches. *Id.* The first congress that convened following the adoption of the Constitution expressed its disapproval of nighttime searches by enacting two statutes that authorized only daytime searches—Act of July 31, 1789, § 24, 1 Stat. 43, and Act of March 3, 1791, § 29, 1 Stat. 206. *United States ex rel. Boyance v. Myers*, 398 F.2d 896, 898 (3d Cir.1968).

The aversion to nighttime searches that motivated these early statutes was also reflected in the other writings of the founders. For example, as early as 1774,

---

**3.** However, vessels not on the land could be searched day and night. Lasson, *supra* at 54 n. 17.

John Adams described the unique status of the home during the night:

> Every English[man] values himself exceedingly, he takes a Pride and he glories justly in that strong Protection, that sweet Security, that delightfull Tranquillity which the Laws have thus secured to him in his own House, especially in the Night. Now to deprive a Man of this Protection, this quiet and Security in the dead of Night, when himself and Family confiding in it are asleep, is treat[ing] him not like an Englishman not like a Freeman but like a Slave * * *.

1 Legal Papers of John Adams 137 (L. Kinvin Wroth & Hiller B. Zobel eds., The Belknap Press 1965) (republished from the 1774 original). The special status of a person's home at night is also reflected in the fact that at common law, attempt offenses were only misdemeanors, but breaking into a house at night with the intent to commit a felony was a felony. Thomas Y. Davies, *Recovering the Original Fourth Amendment*, 98 Mich. L.Rev. 547, 642 n. 259 (1999) (citing 4 William Blackstone, *Commentaries on the Laws of England* 223–26 (1769, reprinted facsimile U. Chi. Press, 1979)).

This early aversion to nighttime intrusion into the home indicates that the "factor of a nighttime search is sensitively related to the reasonableness issue" under the constitution. *United States v. Gibbons*, 607 F.2d 1320, 1326 (10th Cir.1979). We believe that this sensitivity related to reasonableness is helpful to our analysis of the purpose of section 626.14 and the interest it seeks to protect.

Interest Protected

As we previously noted, a historic aversion to nighttime searches appears to have been the core purpose behind Minn.Stat. § 626.14, which statute was intended to protect against, at a minimum, the indignity of being roused out of bed in the middle of the night and made to stand by in nightclothes. But it is less evident exactly how far the protection extends and what is the precise interest to be protected. The interest being protected is not simply privacy in one's home—the police may overcome that interest with a warrant supported by probable cause. Thus, in order to determine if a particular violation of the statute subverts the basic purpose of the statute, we must, with the historical context in mind, make further inquiry to more precisely define the interest being protected.

We have previously articulated the policy behind limiting nighttime searches both broadly and narrowly. In *State v. Stephenson*, we defined it broadly when we said it is to protect the public from the " 'abrasiveness of official intrusions' during the night." 310 Minn. 229, 233, 245 N.W.2d 621, 624 (1976) (quoting *United States v. Ravich*, 421 F.2d 1196, 1201 (2d Cir.1970)). Whereas in *Lien* we defined it more narrowly when we said it is to prevent people from being roused out of bed and forced to stand by in their nightclothes while the police conduct the search. 265 N.W.2d at 841. While we find both definitions helpful to our inquiry, neither definition is sufficiently precise for us to resolve the case before us. Therefore, we conclude that in order to determine whether the search of Jackson's home seriously violated an interest that subverts the statute, we must define the protected interest more precisely than we have in the past, and in doing so more clearly incorporate the motivation behind the historical aversion to such searches.

Period of Nighttime Repose

We begin this part of our analysis, with the understanding that any definition of the precise interest protected by restricting nighttime searches must be informed

by the factors that make nighttime searches more intrusive than daytime searches. Some commentators have noted that nighttime searches are more intrusive because of the more personal nature of nighttime activities that occur in the home and because being subject to law enforcement activity produces more anxiety and is interpreted as more threatening at night than during the day. George E. Dix, *Means of Executing Searches and Seizures as Fourth Amendment Issues,* 67 Minn. L.Rev. 89, 150 (1982–83); *see also* Carrie Leonetti, *Open Fields in the Inner City: Application of the Curtilage Doctrine to Urban and Surburban Areas,* 15 Geo. Mason U. Civ. Rts. L.J. 297, 312 n. 60 (2005) (citing cases that recognize the "uniquely intrusive" nature of nighttime searches of the home and that people awakened at night by the police are "uniquely vulnerable"). We also note that the protection against nighttime searches is aimed at a period of time—nighttime— and at certain private activities that occur in the home during that time. Accordingly, we believe it is appropriate to define the interest protected as freedom from intrusion during *a period of nighttime repose.*

The American Heritage Dictionary defines "repose" alternatively as "the state of being at rest," "[f]reedom from worry; peace of mind," and "[c]almness; tranquility." *The American Heritage Dictionary* 1480 (4th ed.2000). Black's Law Dictionary defines "repose" as "[c]essation of activity; temporary rest." *Black's Law Dictionary* 1327 (8th ed.2004). And Bryan A. Garner states that repose "is not 'indefinite dormancy,' but rather suggests temporary rest, after which there will again be activity." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 759 (2d ed.1995). These definitions of repose are consistent with language that appears in case law as well as the previously cited language used

by John Adams in describing the special security and tranquility of the home at night.

We believe that at certain times it will be readily apparent what is protected during this period of nighttime repose. For example, if the police search an unlit home at 3 a.m. without proper nighttime authorization, they run considerable risk of violating the occupants' interest in being free from intrusion during a nighttime period of repose. But if the police search a home at 8:30 p.m. on the summer solstice when the doors are open and a party is underway at a home, they are much less likely to run the risk of seriously violating the occupants' interest in being free from such intrusion. These examples illustrate a key aspect that we recognize and acknowledge about the interest we have articulated, especially at its beginning and end. This definition is a bit nebulous and necessarily encompasses what Justice Robert Jackson might refer to as a "zone of twilight," within which the right to protection is less certain and will depend "on the imperatives of events and contemporary imponderables rather than on abstract theories of law." *Youngstown Sheet Tube Co. v. Sawyer,* 343 U.S. 579, 637, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Jackson, J., concurring). Nevertheless, we conclude that our definition of a period of nighttime repose provides a good template to determine the basic purpose behind section 626.14 and in turn whether that purpose has been subverted in this case. We reach this conclusion because this definition of the protected interest accounts for both the temporal factor "nighttime" and the private nature of customary nighttime activities, "repose."

Was the Basic Purpose of Minn.Stat. § 626.14 Seriously Violated?

Having defined the interest that the limitation on nighttime searches pro-

tects, we now examine the facts of this case to determine if that interest was seriously violated. The police entered Jackson's Minnesota home at 9:25 p.m. on December 11 when it would have been dark for several hours. Thus the timing of the search was during the nighttime and well within the 8 p.m. to 7 a.m. envelope that the legislature has designated as the temporal period protected under section 626.14. Further, it is undisputed that when the police entered Jackson's home, they did not have a valid nighttime search warrant. Minnesota Statutes § 626.14 explicitly requires that the police provide the facts in an affidavit showing that a nighttime search outside the hours allowed by the statute "is necessary to prevent the loss, destruction, or removal of the objects of the search or to protect the searchers or the public." It is undisputed that the police did not provide such facts here. On this point, we note that the state explicitly acknowledges this deficiency when it states that it does not contest the conclusion of the district court and the court of appeals that the search warrant application for Jackson's home "did not make a sufficient showing to justify inclusion of the nighttime search clause." Given both of the aforementioned deficiencies—the time of the search and the lack of information provided to the court—we conclude that these deficiencies represent fundamental departures from the mandate of section 626.14 and constitute serious violations of the basic purpose of the statute to prohibit searches between 8 p.m. and 7 a.m. absent specific facts sworn to in an affidavit.

## State v. Lien Distinguished

Both the state and dissent assert that the violation here is not a serious violation based on our resolution of a similar question in *State v. Lien,* 265 N.W.2d 833 (Minn.1978). In *Lien,* the police obtained a search warrant authorizing a nighttime search of Lien's apartment. *Id.* at 836. While waiting outside Lien's apartment, the police observed several people coming and going from the apartment and then, shortly after 9 p.m., they saw an individual meeting Lien's description arrive and enter the apartment. *Id.* Upon finding the door to the apartment slightly open, the police entered the apartment. *Id.* The evidence seized from the apartment was later suppressed by the district court on the ground that the warrant application did not contain a sufficient factual showing to justify nighttime execution of the warrant. *Id.*

On review, we agreed that Minn.Stat. § 626.14 had been violated, but we went on to conclude that suppression of evidence obtained as a direct result of the invalid search was not required because the violation was merely technical. *Lien,* 265 N.W.2d at 841. In reaching this conclusion, we noted that the search warrant was executed at "a reasonable hour when most people are still awake" and that "the intrusion was not the kind of nighttime intrusion—with people being roused out of bed and forced to stand by in their night clothes while the police conduct the search—that our statutory rule against nighttime execution of search warrants is primarily designed to prevent." *Id.* at 841. Importantly, we also relied on the fact that the police knew, before executing the warrant, that Lien, who was the focus of the search, had just returned home, that he was fully clothed, that there was considerable activity in his apartment, and that the door to the apartment was partly open. *Id.*[4]

4. Because we engaged primarily in a constitutional analysis in *Lien,* we did not specifically hold that suppression was not required because the violation did not subvert the basic

We conclude that Jackson's case is distinguishable from *Lien* because before the police entered Jackson's home they lacked the type of information that the police who entered Lien's apartment possessed before entering. In *Lien*, the police knew before entering the apartment that Lien was not sleeping, was not engaged in personal behavior which he was attempting to keep private, and that he was fully clothed. 265 N.W.2d at 836, 841. In essence, the police knew before they went into Lien's home that he had not entered the period of nighttime repose that section 626.14 was intended to protect. In contrast, the record in this case is silent as to whether the police officers who entered and searched Jackson's home had information about what was going on inside the home before they entered. They did not know whether Jackson was sleeping, whether she was engaging in personal behavior, or whether she was in her nightclothes. In addition, there was no indication that Jackson had opened her home to others by leaving the door open or by allowing others to come and go from her home. In short, the police had no basis to believe that Jackson had not yet entered the period of nighttime repose that section 626.14 protects.

After—Acquired Information

■ Probable cause to search a home must be based on facts known to police before entrance into the home. *State v. Lohnes*, 344 N.W.2d 605, 610 (Minn.1984). Similarly, the assessment that a particular nighttime intrusion will not subvert the purpose of section 626.14 must also be based on what the police knew *before* entering a home at night if they hope to avoid suppression of any evidence seized from the home. We conclude that allowing the state to characterize an insuffi-

ciently supported nighttime intrusion into Jackson's home as a mere technical rather than serious violation based on an after-the-fact assessment that she and her children had not yet entered a period of nighttime repose significantly undermines Jackson's statutory right to be free from the "abrasiveness of official intrusions" during the night. *Stephenson*, 310 Minn. at 233, 245 N.W.2d at 624, (stating that "[t]he policy behind prohibiting nighttime searches in the absence of specific judicial authorization in the warrant is to protect the public from the 'abrasiveness of official intrusion' during the night." (quoting *Ravich*, 421 F.2d at 1201)). We therefore find it difficult to accept the dissent's reasoning that the fact that Jackson and her children happened to be out of bed, awake, fully clothed and seated at the kitchen table when the police entered the home, can justify this nighttime intrusion into Jackson's home. In essence, we conclude that what the police knew before entering Jackson's home is critical because the purpose of the statute would be subverted if an unjustified nighttime entrance could be justified by what police learned after entrance into the home.

At bottom, Minn.Stat. § 626.14 is directed at both an aversion to nighttime searches and police conduct. With respect to police conduct, it specifically aims to prevent police intrusion into the personal and private activities of individuals in their homes at night unless the police articulate facts sufficient to support their intrusion. It is the responsibility of the police to follow the statute by stating facts in an affidavit that the nighttime search "is necessary to prevent the loss, destruction, or removal of the objects of the search or to protect the searchers or the public."

purpose of the nighttime search statute. However, we did conclude that the violation was merely technical and that it was not the

type of violation that the statute aims to prevent. *Lien*, 265 N.W.2d at 840–41.

Minn.Stat. § 626.14 In this regard we find our reasoning and analysis in *Cook,* where we upheld the suppression of evidence obtained as the result of an illegal search, to be more compelling than the state and the dissent's reliance on language in *Lien.* *Cook,* 498 N.W.2d at 21–22 (holding that a rule violation subverted the basic purpose of the rule when police failed to provide advance documentation necessary to support a telephonic search warrant). Here it is undisputed by all the parties that the police did not meet this burden of providing sufficient facts. Finally, while it is true that the likelihood of rousing individuals out of bed "less than an hour-and-a-half" into the statutory deadline may be less than it would be three or more hours into the deadline, we do not want to encourage the police to play the odds by ignoring the statutory timeframe in the hopes of catching the occupants of a home awake and fully clothed.

District Court Erred When It Did Not Suppress Evidence

For the preceding reasons, we conclude that the violations of Minn.Stat. § 626.14 were not mere technical violations but were serious violations. Accordingly, we conclude that admitting the evidence seized from Jackson's home would subvert the basic purpose of section 626.14. Therefore, we hold that the district court erred when it failed to suppress the evidence seized during the invalid nighttime search of Jackson's home.

## II.

Having concluded that suppression of the evidence seized from Jackson's home is warranted in light of a statutory violation, we normally would not reach Jackson's constitutional argument. We generally avoid ruling under the constitution if there is another basis upon which a case can be resolved. *Bourke,* 718 N.W.2d at 926. But, as previously noted, we have said that the general rule against nighttime searches may also have constitutional dimensions. In *Lien* we said:

> Although the general rule against nighttime searches is statutory, it may also have a constitutional dimension. Justice Marshall in a dissenting opinion, joined by Justice[s] Douglas and Brennan, in *Gooding v. United States,* 416 U.S. 430, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974), while stating that the constitutional issue was not presented in that case, added that he believed the Constitution required additional justification for a nighttime search of a home over and above the ordinary showing of probable cause.
>
> Underlying the Minnesota statutory rule as well as Justice Marshall's suggested constitutionally based rule is the belief that a nighttime search of a home involves a much greater intrusion upon privacy and is presumably more alarming than an ordinary daytime search of a home.

265 N.W.2d at 839–40 (citing *Stephenson,* 310 Minn. 229, 245 N.W.2d 621). We agree that there are constitutional implications that underlie Minn.Stat. § 626.14 and that the statute is a means by which defendants are protected from unconstitutional nighttime searches. Therefore, in light of the constitutional implications of the statute's proscription of nighttime searches of homes, the dissent's conclusion that suppression is not required under the statute, and the likely recurrence of this issue coming before us in the future,[5] we will address Jackson's constitutional arguments.

Both the Fourth Amendment of the United States Constitution and Article I, § 10 of the Minnesota Constitution provide

---

5. *See State v. Jordan,* 742 N.W.2d 149, No. A06 1445 (Minn. Dec. 6, 2007).

that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." In *Boyd v. United States*, the United States Supreme Court held that in order to protect important personal security and property rights, the Fourth Amendment should be liberally construed. 116 U.S. 616, 635, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

> [I]llegitimate and unconstitutional practices get their first footing * * * by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.

*Id.* The Court reinforced this rule when it held that evidence seized in violation of the Fourth Amendment cannot be used against a defendant at trial. *Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914) (in respect to federal prosecutions); *Mapp v. Ohio*, 367 U.S. 643, 654, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (in respect to state prosecutions). In adopting the foregoing exclusionary rule, the Court reasoned that if illegally seized evidence can be used against a citizen accused of an offense, "the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and so far as those thus placed are concerned, might as well be stricken from the Constitution." *Weeks*, 232 U.S. at 393, 34 S.Ct. 341.

While the Supreme Court has never held that a nighttime search implicates the reasonableness requirement of the Fourth Amendment, it has repeatedly acknowledged the especially intrusive nature of nighttime searches of the home. *See, e.g., Gooding v. United States*, 416 U.S. 430, 462, 94 S.Ct. 1780, 40 L.Ed.2d 250 (1974) (Marshall, J., dissenting) (noting that "there is no expectation of privacy more reasonable and more demanding of constitutional protection than our right to expect that we will be let alone in the privacy of our homes during the night"); *Coolidge v. New Hampshire*, 403 U.S. 443, 477, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971) (referring to a midnight entry into a home as an "extremely serious intrusion"); *Monroe v. Pape*, 365 U.S. 167, 209–210, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (Frankfurter, J., concurring in part, dissenting in part) (noting that, at common law, nighttime searches of the home were the most obnoxious form of official intrusion); *Frank v. Maryland*, 359 U.S. 360, 366, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959) (noting that the intrusion did not involve a "midnight knock on the door, but an orderly visit in the middle of the afternoon"); *Jones v. United States*, 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958) (noting that "it is difficult to imagine a more severe invasion of privacy than the nighttime intrusion into a private home"). Our court has also acknowledged that "a nighttime search of a home involves a much greater intrusion upon privacy and is presumably more alarming than an ordinary daytime search of a home." *Lien*, 265 N.W.2d at 839–40.

Further, several federal circuit courts have held that unauthorized nighttime searches violate the Fourth Amendment. For example, in *United States v. Merritt*, the Third Circuit considered a motion to suppress made by a defendant whose home had been searched at 7:30 p.m. with a warrant that authorized only a daytime

search. 293 F.2d 742, 743 (3d Cir.1961). The court held that "[s]ince the warrant was 'legally invalid' the officers' entry into the defendant's apartment was on the same plane as an entry without any warrant at all and as such was an unlawful 'invasion' within the proscription of the Fourth Amendment." *Id.* at 746; *see also O'Rourke v. City of Norman*, 875 F.2d 1465, 1475 (10th Cir.1989) (holding a 10 p.m. search of a home without a nighttime endorsement on the warrant unreasonable under the Fourth Amendment); *Boyance*, 398 F.2d at 898–99 (holding constitutionally invalid a 2 a.m. search of a home conducted with a warrant that authorized only a daytime search). In addition, other circuits have recognized the uniquely intrusive nature of nighttime searches of the home. *See, e.g., United States v. Jerez*, 108 F.3d 684, 690 (7th Cir.1997) (recognizing the "particular intrusiveness of nocturnal encounters with the police at one's dwelling"); *Ravich*, 421 F.2d at 1201 (recognizing the "peculiar abrasiveness of official intrusions" at night).

The state and the dissent essentially ignore the historical context of the Fourth Amendment in their analysis; but we consider this historical perspective to be a critical factor in any case involving a nighttime search.[6] The Supreme Court has explicitly held that "[t]he Fourth Amendment is to be construed in light of what was deemed an unreasonable search and seizure when it was adopted * * *." *Carroll v. United States*, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925). As we have already noted, the Fourth Amendment was in part a reaction to the general warrants of England and the writs of assistance used in the colonies that virtually permitted unlimited discretion regarding

when and were to conduct a search. *Steagald*, 451 U.S. at 220, 101 S.Ct. 1642. Moreover, the fact that 12 of the original states and the First Congress enacted statutory prohibitions of nighttime searches strongly suggests that such searches were considered unreasonable when the Fourth Amendment was adopted.

Jackson also argues that because nighttime searches and unannounced searches both involve entry into the home in a manner rejected at common law, they should both be subject to the same constitutional constraints. In *Wilson v. Arkansas*, the Supreme Court held that the "common-law 'knock and announce' principle forms a part of the reasonableness inquiry under the Fourth Amendment." 514 U.S. 927, 929, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995). The Court reasoned that "[g]iven the longstanding common-law endorsement of the practice of announcement, we have little doubt that the Framers of the Fourth Amendment thought that the method of an officer's entry into a dwelling was among the factors to be considered in assessing the reasonableness of a search or seizure." *Id.* at 934, 115 S.Ct. 1914. We note that a nighttime search can be as egregious an invasion as an unannounced search in that the rule against nighttime searches protects individuals from unauthorized police invasion 11 out of 24 hours of the day, whereas the rule against unannounced searches protects individuals for 10 to 15 seconds during which the police must wait before they can enter a home. *See United States v. Banks*, 540 U.S. 31, 38–40, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003).

■■ Given the historical aversion to nighttime searches, the historical recogni-

---

6. For a detailed discussion of the historical aversion to nighttime searches, see Part I of this opinion.

tion of the unique status of persons in their home at night, the Supreme Court's recognition of the especially intrusive nature of nighttime searches of a home and the holdings of several federal courts that nighttime searches implicate the reasonableness requirement of the Fourth Amendment, we conclude that the search of a home at night is a factor to be considered in determining whether a search is reasonable under the Fourth Amendment. We further conclude that in order to be constitutionally reasonable, nighttime searches require additional justification beyond the probable cause required for a daytime search.

In evaluating the reasonableness of an official intrusion beyond the probable cause context, the Supreme Court relies on the balancing test articulated in *Camara v. Municipal Court*, 387 U.S. 523, 536–37, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), that is, the need to search must be balanced against the invasion which the search entails. *See, e.g., Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Minnesota Statutes § 626.14 articulates such a balancing test by allowing nighttime searches only if necessary to prevent the destruction of the objects of the search or for the safety of the searchers or the public. In other words, a magistrate's determination that a nighttime search is necessary, under section 626.14, aims to satisfy the constitutional mandate that law enforcement's need to search at night must be balanced against the invasion of privacy that a nighttime search entails. In this case, the state concedes the insufficiency under section 626.14 of the police officer's assertion that "[t]his investigation has led your affiant into the nightime [sic] scope of search warrant." The state's concession is appropriate and well-grounded. For the reasons articulated below, we also conclude that for the same reason the police assertions were insufficient to meet the requirements of section 626.14, they are insufficient to render a nighttime search of Jackson's home reasonable under the Fourth Amendment.

Having previously defined the interests that the limitation on nighttime searches is designed to protect, we now examine the facts of this case to determine if Jackson's constitutional rights were violated. The police entered Jackson's home at 9:25 p.m. on December 11 when it would have been dark for several hours. The record does not indicate that the police had any specific information about what was going on in the home before entering it at nighttime. Further, for the same reasons as stated in section I, we conclude that the nighttime entry into Jackson's home cannot be rendered constitutionally sound by the fact that the police happened to find Jackson and her children awake, fully clothed, and sitting at the kitchen table upon entering the home. Therefore, we conclude that the police violated Jackson's right to be free from unreasonable searches and seizures guaranteed by the United States Constitution when, without information indicating that Jackson had not yet entered a period of nighttime repose, they entered her home at 9:25 p.m. in the wintertime— December 11—with a search warrant that invalidly authorized a nighttime entry. In reaching this conclusion we need not decide the exact time when Jackson's constitutionally protected period of nighttime repose began and ended. Rather, we need only conclude that the search of her home fell within the protected time period.

### III.

 Having concluded that Jackson's constitutional rights were violated by this invalid nighttime search, we now turn to the question of whether the evidence seized during the unconstitutional search of her home must be suppressed. Gener-

ally, evidence seized in violation of the constitution must be suppressed. *Weeks,* 232 U.S. 383, 34 S.Ct. 341; *Mapp,* 367 U.S. 643, 81 S.Ct. 1684. But, the state suggests that the Supreme Court's recent holding in *Hudson v. Michigan,* that the exclusionary rule does not apply to violations of the knock-and-announce rule, even when police misconduct is involved, may signal that the Court would likewise decline to require suppression of the evidence in this case. *See Hudson v. Michigan,* —— U.S. ——, 126 S.Ct. 2159, 2165, 165 L.Ed.2d 56 (2006).[7] We reject the suggestion that the rule announced in Hudson is controlling with respect to the nighttime search violation that occurred in this case.

In *Hudson,* the police obtained a warrant that did not authorize an unannounced entry to search the home of the defendant. 126 S.Ct. at 2162. The state conceded that upon executing the warrant, the police violated the knock-and-announce rule by waiting only 3–5 seconds between announcing their presence and entering through the unlocked door. *Id.* at 2162. The question before the Court was whether the evidence seized during the search should have been suppressed. *Id.*

We ultimately conclude that *Hudson* is distinguishable for an important reason—an unannounced entry involves significantly different interests than the interests protected by the constitutional prohibition on nighttime searches. At the core of Hudson is the Supreme Court's determination that a knock-and-announce violation does not require suppression was that the police in Hudson would have discovered the evidence whether they had knocked and announced or not. 126 S.Ct. at 2164. In contrast, in the context of a nighttime search, if the police do not search and seize evidence at night, there is no guarantee that it will be there the following day. The Court's reliance on the inevitability of discovery in Hudson is inapplicable here.[8] Unlike the police in *Hudson* who would have found the evidence whether or not they waited the required 10 to 15 seconds before entering the defendant's home, the police in this case would not necessarily have discovered the seized evidence if they had waited until morning to execute the warrant. Because we conclude that *Hudson* is inapplicable, we conclude that the rule announced in *Weeks* and *Mapp* that evidence seized in violation of the Fourth Amendment generally must be suppressed, is the rule applicable to this case.

Since *Weeks,* the Supreme Court has refused to apply the exclusionary rule in only two situations: 1) where the application of the rule would not result in appreciable deterrence, and 2) where the issue involves admissibility in a non-criminal proceeding. *Hudson,* 126 S.Ct. at 2175 (Breyer, J., dissenting). As the dissent in *Hudson* noted, "in every case involving evidence seized during an illegal search of a home * * *, the Court, with the exceptions mentioned, has either explicitly or implicitly upheld (or required) the suppression of the evidence at trial." *Id.* at 2176. Further, in both *Weeks* and *Mapp,* the Court concluded that without the exclusionary rule, the Fourth Amendment essentially grants a right with no remedy. *Id.* at 2172–73. As noted by the dissent in

---

**7.** In *Hudson,* five justices, including Justice Kennedy who wrote a concurring opinion, joined parts I through III of the opinion. 126 S.Ct. at 2161. In discussing the holding of the case, we therefore rely only on those parts, which represent the opinion of the Court.

**8.** We note that the dissent agrees that the rule announced in *Hudson* is inapplicable in this case because *Hudson's* inevitable discovery analysis does not apply to a nighttime search violation.

Hudson, where there is a pattern of violations along with the apparent ineffectiveness of civil remedies, there is a need for the exclusionary rule as a means of deterrence. *Hudson*, 126 S.Ct. at 2175. Here we conclude that the police conduct involved is capable of repetition and that application of the exclusionary rule will have an appreciable deterrent effect.

The state further argues that the evidence seized should not be suppressed because the officers reasonably relied on the nighttime search authorization issued by the district court. The Supreme Court has "long held that the 'touchstone of the Fourth Amendment is reasonableness.' " *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)). Further, the Court has said that reasonableness "is measured in objective terms by examining the totality of the circumstances." *Id.; see also United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002) (stating that "[w]hen discussing how reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing"); *United States v. Martinez–Fuerte*, 428 U.S. 543, 569, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (Brennan & Marshall, JJ., dissenting) (stating that to be reasonable, conduct "must pass muster under objective standards applied to specific facts"). An individual officer's subjective state of mind is not the relevant consideration. In *Brigham City, Utah v. Stuart*, — U.S. —, 126 S.Ct. 1943, 1948, 164 L.Ed.2d 650 (2006), the Court said that "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind 'as long as the circumstances, viewed *objectively* justify [the] action.' " (emphasis added) (quoting *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)). We conclude that this objective standard requires a police officer to have a reasonable knowledge of what the law requires or prohibits. Accordingly we will not defer to a warrant that is based on an affidavit that does not provide a substantial basis for determining probable cause. *See Illinois v. Gates*, 462 U.S. 213, 239, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (stating further that "[s]ufficient information must be presented to the magistrate to allow that official to determine probable cause" and the magistrate's "action cannot be a mere ratification of the bare conclusions of others.").

In this case we conclude that it was not objectively reasonable for the police to rely on the nighttime search authorization issued by the district court when the only justification provided to the court in support of a nighttime search was the police officer's concluding statement that "[t]his investigation has led your affiant into the nightime [sic] scope of search warrant." Since its enactment in 1963, Minn.Stat. § 626.14 has required that authorization for a nighttime search be based on "facts stated in the affidavits that a nighttime search is necessary to prevent the loss, destruction, or removal of the objects of the search." Act of May 23, 1963, ch. 849, § 12, 1963 Minn. Laws 1552, 1555. And since *Lien*, which we decided in 1978, the law has been clear that section 626.14 requires some showing to the district court, beyond a bare assertion, that the warrant can only be executed successfully in the nighttime. *Lien*, 265 N.W.2d at 840. The failure of the police to even attempt to make such a showing precludes them from reasonably relying on the court's authori-

zation for the nighttime search warrant.[9] Because we conclude that the Fourth Amendment provides a separate and independent basis from Minn.Stat. § 626.14 that requires suppression of the evidence seized during the search, we hold that the district court erred when it denied Jackson's motion to suppress the evidence seized as a result of the illegal nighttime search of Jackson's home.[10]

## IV.

Jackson also asserts that *Hudson* is a sharp departure from the precedent of both the Supreme Court and our court,[11] and therefore urges us to explicitly reject *Hudson* and hold that under the Minnesota Constitution, the evidence seized during the unconstitutional nighttime search of her home must be suppressed. Jackson notes that we have said that we are "free to interpret the Minnesota Constitution as affording greater protection against unrea-

sonable searches and seizures than the United States Constitution," and we will do so in order to "safeguard for the people of Minnesota the protections embodied in our constitution." *State v. Askerooth*, 681 N.W.2d 353, 361–62 (Minn.2004). But, because we conclude that suppression is required under both Minn.Stat. § 626.14 and the U.S. Constitution, we do not need to reach Jackson's argument based on the Minnesota Constitution.

Reversed.

ANDERSON, G. BARRY, Justice (dissenting).

I respectfully dissent. We previously held that when a warrant is executed in violation of Minn.Stat. § 626.14 (2006), the evidence obtained as a result of the search will not be suppressed when the violation is technical in nature. *State v. Lien*, 265 N.W.2d 833, 839–41 (Minn.1978). Because

---

9. We specifically reject the dissent's assertion that we have failed to consider the police affidavit in its entirety by not concluding that the assertions that Dawson "dropped methamphetamine off at the Jackson residence and that Jackson also sells methamphetamine from her residence" justify a nighttime search. While such facts do support the issuance of a daytime search warrant, they do not justify a nighttime search warrant—a conclusion that even the state does not contest.

10. The state does not directly cite *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). The dissent supports its position that we should not suppress the evidence seized as the result of the illegal nighttime search of Jackson's home by citing to the "good faith" exception the Supreme Court applied in *Leon*, 468 U.S. at 919–20, 104 S.Ct. 3405. We note, however, that we have consistently declined to adopt, much less even address, the *Leon* "good faith" exception. *See State v. Harris*, 589 N.W.2d 782, 791 n. 1 (Minn.1999) ("[W]e need not address the state's request for us to adopt the 'good faith' exception to the warrant requirement * * *."); *State v. Zanter*, 535 N.W.2d 624, 634

(Minn.1995) ("The state has asked us to adopt a 'good faith' exception to the warrant requirement of article I, section 10 of the Minnesota Constitution. * * * But, because under the specific facts of the present case we believe that the good faith of the police, which we do not question, cannot cure the clear insufficiency of the third warrant application, we decline at this time to address the applicability of a good faith exception."); *State v. Lindsey*, 473 N.W.2d 857, 864 n. 4 (Minn. 1991) ("[W]e need not and do not address the state's contention that this court should follow the so-called good faith exception to the exclusionary rule adopted and applied by the United States Supreme Court * * *."); *State v. McCloskey*, 453 N.W.2d 700, 701 n. 1 (Minn.1990) ("In view of our decision we do not address the issue of whether this court should follow *United States v. Leon* * * *.").

11. *See, e.g., In re Welfare of B.R.K.*, 658 N.W.2d 565, 578–80 (Minn.2003) (warrantless search of a home); *State v. Larsen*, 650 N.W.2d 144, 147–49, 154 (Minn.2002) (warrantless search of fish house); *State v. Hardy*, 577 N.W.2d 212, 217 (Minn.1998) (no probable cause to search).

I conclude that the facts in this case are similar to those in *Lien,* I would affirm the court of appeals and deny suppression of the evidence.

## I.

The State does not challenge the district court's conclusion that the nighttime search warrant was defective. The State argues, rather, that the evidence obtained should not be suppressed despite the defect. The majority holds that the evidence must be suppressed not only because of the statutory violation, but also because the search violated Jackson's constitutional rights. In so holding, the majority attempts to distinguish, but does not overrule, our holding in *Lien.* I disagree with the majority's analysis of that case as it pertains to the facts now before us.

In *Lien,* the police obtained a search warrant authorizing a nighttime search despite failing to make a particularized showing that a nighttime search was necessary either to preserve evidence or to protect the safety of the officers executing the warrant. 265 N.W.2d at 836. Upon observing several people enter and leave the defendant's home and observing the defendant enter the home, the officers executed the warrant shortly after 9 p.m. *Id.* Despite being unable to see inside the home because the curtains were drawn, the officers entered the slightly open door and conducted a search, finding and seizing illegal drugs and other evidence. *Id.* Although we concluded that a nighttime search should not have been authorized, we held that the evidence obtained in the search was admissible. *Id.* at 840–41.

Our decision not to suppress the evidence was based on our conclusion that the error was not of a constitutional nature.

*Id.* at 841. In support of this conclusion, we noted that "the intrusion was not the kind of nighttime intrusion—with people being roused out of bed and forced to stand by in their night clothes while the police conduct the search—that our statutory rule against nighttime execution of search warrants is primarily designed to prevent." *Id.* We further stated, "[I]t is significant that, although the warrant was executed in the nighttime, it was executed at a reasonable hour when most people are still awake." *Id.* We therefore concluded that "while there was a technical violation of our statute, the violation was not of a constitutional nature," and the exclusionary rule should not be applied. *Id.* at 840–41.

Similar to *Lien,* in this case the police approached Jackson's home with a defective nighttime search clause in a search warrant. Also similar to *Lien,* the police did not rouse Jackson or her children out of bed; they were awake, fully clothed, and seated at the kitchen table. Furthermore, 9:25 p.m. is "a reasonable hour when most people are still awake." *Id.* at 841; *cf.* Fed.R.Crim.P. 41(a)(2)(B) (defining "[d]aytime" hours, for purposes of executing search warrants, as 6 a.m. to 10 p.m.).[1] Because Minn.Stat. § 626.14 only allows searches until 8 p.m. absent a particularized showing, there is no question that the officers violated the statute. But, as in *Lien,* the less than an hour-and-a-half technical violation does not warrant suppression.

The majority distinguishes *Lien* based on the fact that "the police had no basis to believe that Jackson had not yet entered [a] period of nighttime repose," an interest that the majority determines section

---

1. The majority emphasizes that the search in this case took place in "Jackson's Minnesota home at 9:25 p.m. on December 11 when it would have been dark for several hours." Why this is relevant is not clear.

626.14 is designed to protect. While I agree that the police had more information regarding the state of the home's occupants in *Lien* before executing the warrant than was available here, I do not agree that such a distinction is relevant, much less dispositive, in this case.

The majority cites no rule or case law that precludes the State from introducing evidence regarding the state of the home's occupants at the time of execution of a warrant. In *Lien,* we made an objective inquiry, considering all of the relevant facts and circumstances concerning the effect of the unlawful nighttime search on the occupant. 265 N.W.2d at 841. In that case, it just so happened that most of those facts and circumstances came to light before the police entered the home. Nevertheless, our inquiry concerns the effect of the unlawful nighttime search on the occupants of the home, regardless of police knowledge. Here, it is the facts that came to light at the time of execution of the warrant that justify not suppressing the evidence, and in the absence of some clear prohibition on consideration of such evidence, the evidence should be considered. For purposes of suppression under section 626.14, the question of *when* the police learned that Jackson and her children were not roused from sleep is not as relevant as the fact that Jackson and her children *were* not roused from sleep.

We also emphasized in *Lien* that the error committed was attributable to the magistrate, not to the police, and that the police acted in "good faith." 265 N.W.2d at 840. Indeed, as is recognized by the majority, section 626.14 is directed at police conduct. The majority's desire to avoid "encourag[ing] the police to play the odds by ignoring the statutory timeframe" is commendable and a worthwhile goal, but it is irrelevant to this case because the police actually obtained a warrant authorizing a nighttime search. As we noted in *Lien,* "[l]ittle more can be expected of a police officer who gathers evidence, presents it to a magistrate, and receives a warrant." *Id.* at 840 n. 1 (citing *Stone v. Powell,* 428 U.S. 465, 496, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (Burger, C.J., concurring)).

If different facts are posited, *e.g.,* the occupants of the home are asleep at the time the warrant is executed, the warrant does not authorize a nighttime search, or there is evidence of what the majority fears might happen—that the police are "play[ing] the odds" in ignoring the statutory requirements—there is little doubt the analysis would change as well. But those are not our facts; here, as in *Lien,* the facts support a conclusion that, at most, we have a technical violation of section 626.14, and I would therefore affirm the court of appeals.

## II.

I would dismiss Jackson's constitutional argument on the basis of *Lien,* where we stated that the error of conducting an unauthorized nighttime search under section 626.14 in that case was not of a "constitutional nature." 265 N.W.2d at 841. We concluded that execution of the warrant did not violate the defendant's rights under the Fourth Amendment to the United States Constitution because the warrant was executed at a reasonable hour and the search did not entail the type of police conduct that section 626.14 was designed to prevent: rousing people out of bed and making them stand by in their night clothes while the search is conducted. *Id.* For the same reasons, I would hold that the police conduct in this case was not of a constitutional nature and suppression is consequently not warranted under the Fourth Amendment.

But even if I disagreed with our constitutional analysis in *Lien,* I would reject the majority's constitutional analysis here. First, it is unclear to me why the majority addresses the constitutional issue at all once it concludes that the statutory violation warrants suppression. We avoid constitutional rulings if an issue can be decided on other grounds. *See State v. Bourke,* 718 N.W.2d 922, 926 (Minn.2006); *In re Senty–Haugen,* 583 N.W.2d 266, 269 n. 3 (Minn.1998) ("It is well-settled law that courts should not reach constitutional issues if matters can be resolved otherwise."). The majority notes "the likely recurrence of this issue," which further justifies exercising judicial restraint. I would wait until the constitutional question is squarely presented before discussing or deciding it.[2]

Regarding the substance of the constitutional analysis, the majority correctly notes that "the Supreme Court has never held that a nighttime search implicates the reasonableness requirement of the Fourth Amendment." *See United States v. Rizzi,* 434 F.3d 669, 675 (4th Cir.2006). The cases relied on by the majority in which federal circuit courts have held that a nighttime search violates the Fourth Amendment involved searches pursuant to a warrant that either prohibited a nighttime search or did not explicitly authorize such a search. *See O'Rourke v. City of Norman,* 875 F.2d 1465 (10th Cir.1989) (where the warrant did not authorize a nighttime search); *United States ex rel. Boyance v. Myers,* 398 F.2d 896 (3d Cir. 1968) (where the warrant only authorized a daytime search); *United States v. Merritt,* 293 F.2d 742 (3d Cir.1961) (where the warrant only authorized a daytime search). In its reliance on these authorities, the majority overlooks the point I emphasized above: the police in this case acted pursuant to a warrant authorizing a nighttime search.

### III.

Even if I agreed that the nighttime search violation in this case implicates the Fourth Amendment, the question before us today is whether the evidence obtained must be suppressed.[3] Not every Fourth Amendment violation requires application of the exclusionary rule. *See United States v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Illinois v. Gates,* 462 U.S. 213, 223, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Indeed, the Supreme Court has noted that the exclusionary rule applies "only where its deterrence benefits outweigh its 'substantial social costs.'" *Pa. Bd. of Prob. & Parole v. Scott,* 524 U.S. 357, 363, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998) (quoting *Leon,* 468 U.S. at 907, 104 S.Ct. 3405). The exclusionary rule is not "a personal constitutional right of the party aggrieved" but is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974).

The majority summarily concludes that suppression of the evidence in this case will have an "appreciable deterrent effect" on police misconduct but fails to demonstrate why that is so. The failure to comply with the nighttime search warrant statute in this case was attributable to the

---

**2.** Furthermore, by addressing the constitutional question after resolving the case on statutory grounds, the majority risks that the last 12 pages of its opinion will be read as mere dicta.

**3.** As an aside, I agree with the majority's recognition that the Supreme Court's decision in *Hudson v. Michigan,* — U.S. ——, 126 S.Ct. 2159, 165 L.Ed.2d 56 (2006), is inapplicable to the suppression issue before us.

judge who issued the warrant, not to the police, and courts do not consider the deterrent effect of suppression on judges and magistrates for purposes of determining whether the exclusionary rule should be applied. *See Leon*, 468 U.S. at 916–17, 104 S.Ct. 3405 (explaining that the exclusionary rule is not intended to deter the mistakes of judges and magistrates).

The Court in *Leon* explained that there is rarely a significant deterrent effect when an officer acts in good faith within the scope of a warrant:

> In most such cases, there is no police illegality and thus nothing to deter. It is the magistrate's responsibility to determine whether the officer's allegations establish probable cause and, if so, to issue a warrant comporting in form with the requirements of the Fourth Amendment. In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient. "[O]nce the warrant issues, there is literally nothing more the policeman can do in seeking to comply with the law."

*Id.* at 920–21, 104 S.Ct. 3405 (quoting *Powell*, 428 U.S. at 498, 96 S.Ct. 3037 (Burger, C.J., concurring)).

As the majority correctly observes, an officer's reliance on a judge's mistaken determination must be objectively reasonable, and this standard requires that the officer have "reasonable knowledge of what the law prohibits." *Id.* at 919–20 n. 20, 104 S.Ct. 3405. We have held that facts in an affidavit revealing that the defendant is involved in drug-related activity can justify inclusion of a nighttime search provision in a warrant. *See Bourke*, 718 N.W.2d at 928–29 (nighttime search authorization was valid where the affidavit indicated that defendant, who was aware that the police knew of his activities, was

at large and could destroy evidence on his property before morning); *State v. Saver*, 295 Minn. 581, 582, 205 N.W.2d 508, 508–09 (1973) (nighttime search authorization was valid where the affidavit stated that a witness had seen the defendant selling drugs).

In declaring that the only justification provided to the court in support of the nighttime authorization was the officer's statement that "[t]his investigation has led your affiant into the nightime [sic] scope of search warrant," the majority fails to consider the officer's affidavit in its entirety. The supporting affidavit stated that Jackson's boyfriend had dropped off methamphetamine at Jackson's home and that Jackson was selling methamphetamine from there. Because, as explained above, evidence of drug-related activity in a supporting affidavit can justify inclusion of a nighttime search provision in a warrant, it was reasonable for the officers to rely on the judge's conclusion that the evidence justified the nighttime search authorization. Although the State concedes, and I agree, that the information contained in the affidavit was an insufficient basis for the authorization of the nighttime search, it was sufficient to make it objectively reasonable for the officers to rely on the judge's determination.

Even if I believed that the nighttime search violation in this case implicates the Fourth Amendment, I would conclude that suppression of the evidence is not required because suppression would not deter wrongful police activity and because the officers reasonably relied on the judge's authorization of the nighttime search.

I would affirm our holding in *Lien* that a technical violation of Minn.Stat. § 626.14 does not implicate a defendant's rights under the Fourth Amendment, and even if Jackson's Fourth Amendment rights were

implicated in this case, I would hold that the exclusionary rule does not apply.

ANDERSON, RUSSELL A., Chief Justice (dissenting).

I join in the dissent of Justice G. Barry Anderson.

GILDEA, Justice (dissenting).

I join in the dissent of Justice G. Barry Anderson.